## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DWIGHT NIEVES,

*Plaintiff*,

v.

THE PLAZA REHABILITATION & NURSING CENTER, CITADEL CARE CENTERS,

*Defendants*.

**Civil Action No.: 1:20-cv-1191**

**COMPLAINT**

Plaintiff Dwight Nieves, through his counsel, states his Complaint against Defendants The Plaza Rehabilitation & Nursing Center and Citadel Care Centers:

### INTRODUCTION

1.      This case is about access—access to information and health care services. As a deaf American, Mr. Nieves primarily communicates in American Sign Language or "ASL" for short. He requires an ASL interpreter to effectively communicate and participate in a health care setting.

2.       "[E]njoyment of the highest attainable standard of health is one of the fundamental rights of every human being"—individuals with and without disabilities. A. Kuenburg, P. Fellinger, & J. Fellinger, Health Care Access Among Deaf People, Journal of Deaf Studies and Deaf Education, 2016, Vol. 21, No. 1:1–10, 1 (internal citations omitted), https://bit.ly/39GAPeZ.

3.      Language is the cornerstone of the patient-physician relationship. Indeed, "it is primarily through language that the physician works to establish rapport and trust. Good physician-patient communication is fundamental to good health care." E. McEwen & H. Anton-Culver, Journal of Family Practice, Vol. 26, No. 3:289–291, 291 (1988), https://bit.ly/2Fn3zLW.

4.      Thus, under the New York City Human Rights Law, covered entities like

Defendants are required "to provide a reasonable accommodation to enable a person with a disability"—like Dwight Nieves—"to enjoy the right or rights in question provided that the disability is known or should have been known." N.Y.C. Admin. Code § 8-107(15)(a).

5.     Thus, "[a] hospital . . . must provide a qualified sign language interpreter to a patient who is deaf as a reasonable accommodation because, in order for a patient in a hospital setting to enjoy the right or rights in question, they require in-depth, time-sensitive, and nuanced communications with medical personnel. A patient will therefore not be able to enjoy the right or rights in question without an interpreter." N.Y.C. Comm'n on Human Rights, Legal Enforcement Guidance on Discrimination on the Basis of Disability, https://on.nyc.gov/2zu4LKj (June 2018), at 64–65.

6.     From December 26, 2018, until February 1, 2019, Mr. Nieves was admitted to The Plaza Rehabilitation & Nursing Center ("The Plaza") after his second heart surgery.

7.     During Mr. Nieves's stay at The Plaza, Defendants repeatedly ignored his requests for ASL interpreters. In fact, Defendants failed to provide ASL interpreters for Mr. Nieves's rehabilitation, consultations with doctors, programs and activities, and discharge.

8.     For a hearing patient, effective communication provides better patient safety, better treatment adherence, and better health care outcomes.

9.     But without equally effective communication, Mr. Nieves cannot make informed health care choices.

10.     Thus, Defendants discriminated against Mr. Nieves by refusing the ASL interpreters that he required to understand and participate in his health care.

11.     Mr. Nieves endured protracted humiliation because of Defendants' failure to provide sign-language interpreters to accommodate his deafness. Defendants' actions caused him

2

greater levels of fear, anxiety, indignity, humiliation, and emotional distress than a hearing person would be expected to experience, and distracted Mr. Nieves from his medical care

12.     Based on Mr. Nieves's experience, it is evident that Defendants have failed to implement proper policies, procedures, and practices respecting the civil rights and communication needs of deaf individuals. Mr. Nieves brings this lawsuit to compel Defendants to cease its unlawful discriminatory practices and implement policies and procedures that will ensure effective communication, full and equal enjoyment, and a meaningful opportunity for deaf individuals to participate in and benefit from Defendants' health care services.

13.     Mr. Nieves bring this action seeking compensatory and punitive damages; declaratory, injunctive, and equitable relief; and attorney's fees and costs to redress Defendants' unlawful discrimination against him on the basis of his disability in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*; Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794; Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116; the New York Human Rights Law ("NYHRL"), Article 15 of the N.Y. Executive Law § 290 *et seq.*; the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*; and Article 28 of the New York Public Health Law Human Rights Law § 2801 et seq. ("NYPHL")

## PARTIES

14.     Plaintiff Dwight Nieves is a resident of Bronx, New York, who is substantially limited in the major life activities of hearing and speaking. Thus, he has a "disability" within the meaning of state and federal civil rights laws.

15.     Defendant Citadel Care Centers is a corporation with a corporate address at 1002 Gates Avenue, Brooklyn, NY 11221. Defendant The Plaza Rehabilitation & Nursing Center is located at 100 West Kingsbridge Road, Bronx, NY 10468. Upon information and belief, Citadel

3

Care Centers owns, oversees, and/or operates The Plaza Rehabilitation & Nursing Center. Upon information and belief, Defendants are recipients of federal financial assistance, including Medicare and Medicaid reimbursements.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction for the federal-law claims under 28 U.S.C. §§ 1331 and 1343 because this action arises under the laws of the United States. This Court also has supplemental jurisdiction for the state-law claims under 28 U.S.C. § 1367 because those claims are substantially related to the federal-law claims.

17.    Venue is proper in this District under 28 U.S.C. § 1391(b) because, among other things, Defendants reside in this District and the acts and omissions giving rise to this Complaint occurred in this District.

## STATEMENT OF FACTS

18.    Dwight Nieves is a profoundly deaf individual who communicates primarily in American Sign Language. He cannot effectively communicate by reading a person's lips.

19.    Some background on Deaf[1] culture is necessary to understand the balance of this case. American Sign Language, "the sixth most commonly used language in this country," is not a gestured form of English. "ASL is a mix of native signs and French sign language. Some words are finger-spelled, borrowed from English the same way that the words gourmet, roulette, and taco are borrowed from French and Spanish." And the native signs derive from "hand shape, palm direction, placement of the hand on the body or within the signing space, movement, and non-

---

[1] "[T]he word deaf is written with either an uppercase or lower-case 'D.' When referring to the audiological condition of deafened people, deaf is written with a lower-case 'd.' An uppercase 'D' is used when writing about the Deaf culture, a group with which many prelingually deaf people affiliate themselves." D. Scheier, Barriers to Health Care for People with Hearing Loss: A Review of Literature, Journal of the New York State Nurses Association at 4, https://bit.ly/2QYg8T6.

manuals (facial expressions)." D. Scheier, Barriers to Health Care for People with Hearing Loss: A Review of Literature, Journal of the New York State Nurses Association at 6, https://bit.ly/2QYg8T6 (internal citations omitted).

20.     In other words, "ASL is a visual, three-dimensional, non-linear language, and its grammar and syntax differ from the grammar and syntax of English and other spoken languages." *U.S. E.E.O.C. v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1105 (9th Cir. 2010). "In many cases, there is no one-to-one correspondence between signs in ASL and words in the English language." *Id.*

21.     Unfortunately, "many physicians are reportedly unaware of Deaf culture and the health needs of deaf people. This may lead to assumptions and misconceptions about deafness that undermine professional health care. For example, practitioners often believe that lip reading/speech reading and note writing provide effective health communication. In reality, these are ineffective communication modalities for health care conversations. Deaf people who have practiced lip-reading/speech-reading for many years and who are familiar with spoken language are able to understand at best 30-45% of spoken English. Furthermore, note-writing is often constrained by deficits in health literacy and limited 'fund of information' deficits." A. Kuenburg, P. Fellinger, & J. Fellinger, Health Care Access Among Deaf People, Journal of Deaf Studies and Deaf Education, 2016, Vol. 21, No. 1:1–10, 2 (internal citations omitted), https://bit.ly/39GAPeZ.

22.     On or about December 26, 2018, Mr. Nieves was admitted to The Plaza Rehabilitation & Nursing Center ("The Plaza") after his second heart surgery.

23.     Mr. Nieves stayed at The Plaza until February 1, 2019.

24.     During his entire stay at The Plaza—lasting more than a month—Mr. Nieves received a maximum of four Video Remote Interpreting ("VRI") services, with each session

lasting no longer than 10 minutes.

25.     Mr. Nieves made numerous requests for ASL interpreters to Defendants' staff, including Doctor Kim.

26.     Defendants' staff continuously ignored his repeated requests for ASL interpreters.

27.     Defendants failed to provide ASL interpreters for Mr. Nieves's rehabilitation.

28.     Although The Plaza had various activities for its residents, Mr. Nieves could not attend those activities because Defendants failed to provide interpreters necessary for his participation.

29.     Mr. Nieves had checkups with doctors about twice a week. Defendants failed to provide ASL interpretation for those checkups.

30.     On or about January 30, 2019, Mr. Nieves signed a Notice of Transfer/Discharge without the aid of an ASL interpreter. Because the discharge instruction was not provided in ASL, Mr. Nieves was unsure as to what to do after his discharge.

31.     Defendants' actions caused worry and distress that distracted Mr. Nieves from his medical care. The entire situation was harrowing and stressful, and Mr. Nieves felt that his health was put at risk.

32.     The lack of interpreters exacerbated Mr. Nieves's condition, and he suffered anxiety, distress, and the protracted humiliation of not understanding his medical care.

33.     Defendants knew or should have known of their obligations as healthcare providers under the ADA, the RA, and their equivalents to develop policies to promote compliance with these statutes and to provide reasonable accommodations, including the provision of ASL interpreters to ensure effective communication with deaf people.

34.     Defendants' staff knew or should have known that their actions and inactions

created an unreasonable risk of causing Mr. Nieves greater levels of fear, anxiety, indignity, humiliation, and emotional distress than a hearing person would be expected to experience.

35.     Nonetheless, Defendants prevented Mr. Nieves from benefitting from their services by failing to provide the ASL interpreters necessary for him.

36.     In doing so, Defendants intentionally discriminated against Mr. Nieves, acting with deliberate indifference to his federally protected rights.

37.     Defendants' wrongful and intentional discrimination against Mr. Nieves on the basis of disability is reflected by Defendants' failure to train employees and promulgate policies of non-discrimination against deaf and hard of hearing individuals.

38.     Mr. Nieves is entitled to equal access to services offered by Defendants as are enjoyed by non-disabled persons.

39.     Because of his lifelong heart condition, Mr. Nieves wishes to seek care in Defendants' facility, which is about one mile from his home, but he is aware of discriminatory barriers to access at Defendants' facility and is thus deterred from accessing its healthcare services because of the discrimination he has faced and expects to face going forward. Future harm is not speculative because Defendants refused to make in-person ASL interpreters available to ensure effective communication.

40.     Defendants' willful, knowing, and repeated acts of intentional discrimination against Mr. Nieves evince a pattern and practice of discrimination that violated state and federal antidiscrimination laws that caused him to suffer humiliation, anxiety, and other emotional distress.

## CAUSES OF ACTION

**CLAIM I:     Violations of Title III of the Americans with Disabilities Act**

41.     Mr. Nieves incorporates by reference all preceding paragraphs and realleges them in support of this claim.

42.     At all times relevant to this action, Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.*, has been in full force and effect and has applied to Defendants' conduct.

43.     At all times relevant to this action, Mr. Nieves has been substantially limited in the major life activities of "hearing" and "speaking" and thus has a disability within the meaning of the ADA. 42 U.S.C. § 12102(2).

44.     Defendants own, lease, or operate a place of public accommodation within the meaning of Title III of the ADA. 42 U.S.C. § 12181(7)(F).

45.     Title III of the ADA provides that no "individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

46.     Title III of the ADA defines discrimination to include "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(iii).

47.     Under Title III of the ADA, it "shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 42 U.S.C. § 12182(b)(1)(E).

48.     Federal regulations implementing Title III of the ADA provide that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure

8

effective communication with individuals with disabilities. This includes an obligation to provide effective communication to companions who are individuals with disabilities." 28 C.F.R. § 36.303(c).

49.   "The key to communicating effectively is to consider the nature, length, complexity, and context of the communication and the person's normal method(s) of communication." ADA Requirements – Effective Communication, U.S. Dep't of Justice, *available at* http://www.ada.gov/effective-comm.htm (last visited June 11, 2019) ("DOJ Rules"), at 1.

50.   "In a doctor's office," for example, "an interpreter generally will be needed for taking the medical history of a patient who uses sign language or for discussing a serious diagnosis and its treatment options." DOJ Rules at 3.

51.   "Title III entities are ***encouraged*** to consult with the person with a disability to discuss what aid or service is appropriate. The goal is to provide an aid or service that will be effective, given the nature of what is being communicated and the person's method of communicating." DOJ Rules at 4 (emphasis in original).

52.   Defendants discriminated against Mr. Nieves on the basis of his disability in violation of Title III of the ADA and its implementing regulations.

53.   "A critical and often overlooked component of ensuring success[ful] communication is comprehensive and ongoing staff training. Covered entities may have established good policies, but if front line staff are not aware of them or do not know how to implement them, problems can arise. Covered entities should teach staff about the ADA's requirements for communicating effectively with people who have communication disabilities." DOJ Rules at 4.

54.   Defendants have failed to implement policies, procedures, and training of staff

9

necessary to ensure compliance with Title III of the ADA and its implementing regulations.

55.     Mr. Nieves is entitled to injunctive relief and an award of attorney's fees, costs, and disbursements under the ADA. 42 U.S.C. § 12188(a)(1)–(2); 42 U.S.C. § 2000a-3.

**CLAIM II:    Violations of Section 504 of the Rehabilitation Act**

56.     Mr. Nieves incorporates by reference all preceding paragraphs and realleges them in support of this claim.

57.     At all times relevant to this action, Section 504 of the Rehabilitation, 29 U.S.C. § 794, has been in full force and effect and has applied to Defendants' conduct.

58.     At all times relevant to this action, Mr. Nieves has had substantial limitations to the major life activities of hearing and speaking and has been an individual with a disability within the meaning of the Rehabilitation Act. 29 U.S.C. § 705(9); 42 U.S.C. § 12102(2).

59.     At all times relevant to this action, Defendants have been a program or activity receiving federal financial assistance under 29 U.S.C. § 794(b).

60.     Section 504 of the Rehabilitation Act provides that no "otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

61.     Defendants discriminated against Mr. Nieves solely on the basis of his disability by denying him meaningful access to the services, programs, and benefits Defendants offer to other individuals and by refusing to provide auxiliary aids and services necessary to ensure effective communication in violation of Section 504 of the Rehabilitation Act.

62.     Defendants have failed to implement policies, procedures, and training of staff necessary to ensure compliance with the Rehabilitation Act and its implementing regulations.

63.     Mr. Nieves is entitled to injunctive relief; attorney's fees, costs, and disbursements;

and compensatory damages for the injuries and loss he sustained as a result of Defendants' discriminatory conduct and deliberate indifference under 29 U.S.C. § 794a.

### CLAIM III:   Violations of the Patient Protection and Affordable Care Act

64.     Mr. Nieves incorporates by reference all preceding paragraphs and realleges them in support of this claim.

65.     At all times relevant to this action, Section 1557 of the Patient Protection and Affordable Care Act has been in full force and effect and has applied to Defendants' conduct.

66.     At all times relevant to this action, Mr. Nieves has had substantial limitations to the major life activities of hearing and speaking and has been an individual with a disability within the meaning of Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116.

67.     At all times relevant to this action, Mr. Nieves's primary language for communication has been American Sign Language, and he "has a limited ability to read, write, speak, or understand English." 45 C.F.R. § 92.4. He has thus been an individual with limited English proficiency within the meaning of Section 1557 of the Patient Protection and Affordable Care Act.

68.     At all times relevant to this action, Defendants received federal financial assistance, including Medicare and Medicaid reimbursements, and have been principally engaged in the business of providing health care. Thus, Defendants are a health program or activity receiving federal financial assistance under 42 U.S.C. § 18116(a).

69.     Under Section 1557 of the Patient Protection and Affordable Care Act, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116.

70.     Federal regulations implementing Section 1557 of the Patient Protection and Affordable Care Act provide that a "covered entity shall take reasonable steps to provide meaningful access to each individual with limited English proficiency eligible to be served or likely to be encountered in its health programs and activities." 45 C.F.R. § 92.201(a).

71.     Federal regulations implementing Section 1557 of the Patient Protection and Affordable Care Act provide that (1) a "covered entity shall offer a qualified interpreter to an individual with limited English proficiency when oral interpretation is a reasonable step to provide meaningful access for that individual with limited English proficiency" and (2) a "covered entity shall use a qualified translator when translating written content in paper or electronic form." 45 C.F.R. § 92.201(d)(1)–(2).

72.     Federal regulations implementing Section 1557 of the Patient Protection and Affordable Care Act provide that a "covered entity that provides a qualified interpreter for an individual with limited English proficiency through video remote interpreting services in the covered entity's health programs and activities shall provide" (1) "[r]eal-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication, (2) a "sharply delineated image that is large enough to display the interpreter's face and the participating individual's face regardless of the individual's body position," (3) a "clear, audible transmission of voices," and (4) "[a]dequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the video remote interpreting." 45 C.F.R. § 92.201(f)(1)–(4).

73.     Federal regulations implementing Section 1557 of the Patient Protection and Affordable Care Act provide that a "covered entity shall take appropriate steps to ensure that

communications with individuals with disabilities are as effective as communications with others in health programs and activities." 45 C.F.R. § 92.202(a).

74.     Federal regulations implementing Section 1557 of the Patient Protection and Affordable Care Act provide that a "[covered] entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a [covered] entity. . . . In determining what types of auxiliary aids and services are necessary, a [covered] entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." 45 C.F.R. § 92.202(a); 28 C.F.R. § 35.160(b).

75.     As set forth above, Defendants discriminated against Mr. Nieves on the basis of his disability in violation of the Patient Protection and Affordable Care Act and its implementing regulations.

76.     The Patient Protection and Affordable Care Act, by incorporating the enforcement mechanism of the Rehabilitation Act, extends a cause of action to Mr. Nieves—that is, "any person aggrieved" by discrimination in violation of the Rehabilitation Act. 42 U.S.C. § 18116(a).

77.     Defendants have failed to implement policies, procedures, and training of staff necessary to ensure compliance with the Patient Protection and Affordable Care Act.

78.     Mr. Nieves is entitled to injunctive relief; attorney's fees, costs, and disbursements; and compensatory damages for the injuries and loss they sustained as a result of Defendants' discriminatory conduct and deliberate indifference as alleged under 42 U.S.C. § 18116(a).

## CLAIM IV:   Violations of the New York Human Rights Law

79.     Mr. Nieves incorporates by reference all preceding paragraphs and realleges them in support of this claim.

80.     At all times relevant to this action, the New York Human Rights Law has been in full force and effect and has applied to Defendants' conduct.

81.     At all times relevant to this action, Mr. Nieves has had substantial impairments to the major life activities of hearing and speaking and thus is a qualified individual with a disability within the meaning of N.Y. Exec. Law § 292(21).

82.     At all times relevant to this action, Defendants' facilities have been places of public accommodation within the meaning of N.Y. Exec. Law § 292(9).

83.     Under N.Y. Exec. Law § 296(2)(a), it "shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation . . . because of the . . . disability . . . of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . to the effect that any of the accommodations, advantages, facilities or privileges of any such place shall be refused, withheld from or denied to any person on account of . . . disability. . . or that the patronage or custom thereat of any person of . . . or having a disability is unwelcome, objectionable or not acceptable, desired or solicited."

84.     Under N.Y. Exec. Law § 296(2)(c)(i), discrimination includes "a refusal to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities."

85.     Defendants discriminated against Mr. Nieves by withholding the accommodations, advantages, facilities or privileges of Defendants' place of public accommodation in violation of

N.Y. Exec. Law § 296(2)(a) and by failing to effectively accommodate his disability in violation of N.Y. Exec. Law § 296(2)(c)(i).

86.     Defendants further discriminated against him by failing to ensure effective communication through an in-person interpreter.

87.     Without injunctive relief, there is a clear risk that Defendants' actions will recur with Mr. Nieves or other deaf and hard of hearing individuals.

88.     Mr. Nieves is entitled to injunctive relief and compensatory damages for the injuries and loss sustained as a result of Defendants' discriminatory conduct under N.Y. Exec. Law § 297(9).

### CLAIM V:     Violations of the New York City Human Rights Law

89.     Mr. Nieves incorporates by reference all preceding paragraphs and realleges them in support of this claim.

90.     At all times relevant to this action, the New York City Human Rights Law has been in full force and effect and has applied to Defendants' conduct.

91.     At all times relevant to this action, Mr. Nieves has had substantial impairments to the major life activities of hearing and speaking and thus is a qualified individual with a disability within the meaning of N.Y.C. Admin. Code § 8-102.

92.     At all times relevant to this action, Defendants' facilities have been a places of public accommodation within the meaning of N.Y.C. Admin. Code §  8-102.

93.     Under the NYCHRL, places of public accommodation are required to make reasonable accommodations for persons with disabilities, and may not "refuse, withhold from or deny to [disabled] person[s] the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation." N.Y.C. Admin. Code §  8-107(4)(1)(a).

94.     Additionally, a place of public accommodation is required "to provide a reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." N.Y.C. Admin. Code § 8-107(15)(a).

95.     Furthermore, a place of public accommodation is required "to engage in a cooperative dialogue within a reasonable time with a person who has requested an accommodation or who the covered entity has notice may require an accommodation related to disability." N.Y.C. Admin. Code § 8-107(28)(b).

96.     Thus, "[a] hospital . . . must provide a qualified sign language interpreter to a patient who is deaf as a reasonable accommodation because, in order for a patient in a hospital setting to enjoy the right or rights in question, they require in-depth, time-sensitive, and nuanced communications with medical personnel. A patient will therefore not be able to enjoy the right or rights in question without an interpreter." N.Y.C. Comm'n on Human Rights, Legal Enforcement Guidance on Discrimination on the Basis of Disability, https://on.nyc.gov/2zu4LKj (June 2018), at 64–65.

97.     Defendants discriminated against Mr. Nieves on the basis of his disability by withholding the accommodations, advantages, facilities, or privileges of Defendants' medical services in violation of N.Y.C. Admin. Code § 8-107(4)(1)(a), by failing to effectively accommodate Plaintiff's disability in violation of N.Y.C. Admin. Code § 8-107(15)(a), and by failing to engage in a cooperative dialogue in violation of N.Y.C. Admin. Code § 8-107(28)(b).

98.     Without injunctive relief, there is a clear risk that Defendants' actions will recur with Mr. Nieves or other deaf and hard of hearing individuals.

99.     Mr. Nieves is thus entitled to compensatory and punitive damages for the injuries

and loss sustained as a result of Defendants' discriminatory conduct under N.Y.C. Admin. Code § 8-502(a).

100.    He is further entitled to an award of attorney's fees, expert fees, and other costs under N.Y.C. Admin. Code § 8-502(g).

**CLAIM VI:   Violations of the New York Public Health Law**

101.    Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

102.    At all times relevant to this action, Article 28 of the New York Public Health Law Human Rights Law, § 2801 et seq. has been in full force and effect and has applied to Defendants' conduct.

103.    At all times relevant to this action, Defendants' facility has been a "nursing home" and/or a "residential health care facility" within the meaning of N.Y. Pub. Health L. § 2801(2)-(3).

104.    Pursuant to N.Y. Pub. Health L. § 2801-d, "Any residential health care facility that deprives any patient of said facility of any right or benefit, as hereinafter defined, shall be liable to said patient for injuries suffered as a result of said deprivation, except as hereinafter provided. For purposes of this section a ["]right or benefit["] of a patient of a residential health care facility shall mean any right or benefit created or established for the well-being of the patient by the terms of any contract, by any state statute, code, rule or regulation or by any applicable federal statute, code, rule or regulation . . . ["]injury["] shall include, but not be limited to, physical harm to a patient; emotional harm to a patient; death of a patient; and financial loss to a patient."

105.    Pursuant to N.Y. Pub. Health L. 2803-c(2), "every nursing home and facility providing health related service . . . shall adopt and make public a statement of the rights and responsibilities of the patients who are receiving care in such facilities, and shall treat such patients in accordance with the provisions of such statement."

106.     Pursuant to N.Y. Pub. Health L. 2803-c(3)(e), "[e]very patient shall have the right to receive adequate and appropriate medical care, to be fully informed of his or her medical condition and proposed treatment unless medically contraindicated, and to refuse medication and treatment after being fully informed of and understanding the consequences of such actions."

107.     As set forth above, Defendants denied Plaintiff's rights under federal and state laws, including Plaintiff's right to be fully informed of his medical condition and treatment.

108.     N.Y. Pub. Health L. § 2801-d(1), extends a private right of action and relief to a patient who has been  deprived of "any right or benefit" at "any residential health care facility"

109.     Plaintiff is therefore entitled to injunctive relief, as well as compensatory damages including punitive damages and attorney's fees for the injuries and loss sustained as a result of Defendants' conduct as hereinbefore alleged pursuant to N.Y. Pub. Health L. § 2801-d.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays:

A.     Enter a declaratory judgment under Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' policies, procedures, and practices have subjected Plaintiff to unlawful discrimination in violation of Title III of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, Section 1557 of the Patient Protection and Affordable Care Act, the New York Human Rights Law, the New York City Human Rights Law, and the New York Public Health Law;

B.     Issue an injunction forbidding Defendants from implementing or enforcing any policy, procedure, or practice that denies deaf or hard of hearing individuals or their companions, meaningful access to and full and equal enjoyment of Defendants' facilities, services, or programs;

C.     Issue an injunction ordering Defendants:

i.  to develop, implement, promulgate, and comply with a policy requiring that when a deaf or hard of hearing individual requests an in-person interpreter for effective communication, one will be provided as soon as practicable in all services offered by Defendants;

ii.  to develop, implement, promulgate, and comply with a policy to ensure that Defendants will notify individuals who are deaf or hard of hearing of their right to effective communication. This notification will include posting explicit and clearly marked and worded notices that Defendants will provide sign language interpreters, videophones, and other communication services to ensure effective communication with deaf or hard of hearing persons;

iii.  to develop, implement, promulgate, and comply with a policy to ensure that deaf or hard of hearing individuals are able to communicate through the most appropriate method under the circumstances, recognizing that the Video Remote Interpreting System is not appropriate in all medical situations;

iv.  to develop, implement, promulgate, and comply with a policy to ensure, in the event Defendants use a Video Remote Interpreting System that has a high-speed Internet connection; a video screen with appropriate size, position, capture angle, focus, and proximity to the deaf individual; and appropriate audio quality. When possible, the equipment should be portable and made available to the patient where the patient is located, preferably in a private room to minimize distractions and maintain confidentiality;

v.  to train all their employees, staffs, and other agents on a regular basis about how to properly use a Video Remote Interpreting System, including how to

set it up and how to obtain technical assistance in case of system malfunction or failure, and how to obtain interpreters when reasonably requested by deaf or hard of hearing individuals;

vi.    to create and maintain a list of sign language interpreters and ensure availability of such interpreters at any time of day or night;

vii.   to train all employees, staff, and other agents on a regular basis about the rights of individuals who are deaf or hard of hearing under the ADA, the RA, the ACA, the NYHRL, the NYCHRL, and the NYPHL.

D.    Award to Plaintiff:

i.     Compensatory damages at a minimum of 25% of the daily per-patient rate of payment for each day that the injury existed, for all physical, emotional and financial harm to the Plaintiff pursuant to the NYPHL § 2801-d, in addition to all other damages recoverable under the RA, the ACA, the NYHRL, and the NYCHRL;

ii.    Reasonable costs and attorney's fees under the ADA, the RA, the ACA, the NYCHRL, and the NYPHL;

iii.   Punitive damages under the NYCHRL and the NYPHL;

iv.    Interest on all amounts at the highest rates and from the earliest dates allowed by law;

v.     Any and all other relief that this Court finds necessary and appropriate.

Dated: February 11, 2020

Respectfully submitted,

By:

Andrew Rozynski, Esq.
David John Hommel, Esq.
EISENBERG & BAUM, LLP
24 Union Square East, Fourth Floor
New York, NY 10003
Main: (212) 353-8700
Fax: (212) 353-1708
*Attorneys for Plaintiff*