UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DWIGHT NIEVES,

                         Plaintiff,

           -against-

THE PLAZA REHABILITATION & NURSING
CENTER and CITADEL CARE CENTERS,

                       Defendants.

Case No. 1:20-cv-01191 (JLR)
(OTW)

**OPINION & ORDER**

JENNIFER L. ROCHON, United States District Judge:

      Plaintiff Dwight Nieves ("Plaintiff") brings this action against The Plaza

Rehabilitation and Nursing Center ("the Plaza") and Citadel Care Centers ("Citadel" or,

together with the Plaza, "Defendants"), for violations of the Title III of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. §§ 12181 *et seq.*; Section 504 of the Rehabilitation Act

("RA"), 29 U.S.C. § 794; Section 1557 of the Patient Protection and Affordable Care Act

("ACA"), 42 U.S.C. § 18116; the New York State Human Rights Law ("NYSHRL"), N.Y.

Exec. Law § 290 *et seq.*; the New York City Human Rights Law ("NYCHRL"), N.Y.C.

Admin. Code § 8-101, *et seq.*; and the New York Public Health Law ("N.Y. Pub. Health

Law") § 2801 *et seq.*  *See* ECF No. 1 ("Compl.").  Now before the Court are the parties'

cross-motions for summary judgment on Plaintiff's claims.[1]  For the reasons set forth below,

---

[1] In support of his motion for summary judgment, Plaintiff submitted the following: an opening memorandum of law (ECF No. 79 ("Pl. Br.")), a Rule 56.1 Statement (ECF No. 80 ("Pl. 56.1")), and attached exhibits (ECF No. 78-1).  Defendants filed a brief in opposition (ECF No. 85 ("Def. Opp.")), and a counterstatement to Plaintiff's Rule 56.1 Statement (ECF No. 87 ("Def. 56.1 Counter")).  Plaintiff also filed a brief in reply.  ECF No. 90 ("Pl. Reply").

In support of their motion for summary judgment, Defendants submitted the following:  an opening memorandum of law (ECF No. 82 ("Def. Br.")), a Rule 56.1 Statement (ECF No. 89 ("Def. 56.1")), a declaration of Jane Krupnick in support of the motion (ECF No. 83

Plaintiff's motion is DENIED, and Defendants' motion is DENIED in part and GRANTED in part.

## BACKGROUND

### I.    Factual Background

Plaintiff is deaf.  Pl. 56.1 Counter ¶ 4; Def. 56.1 Counter ¶ 3.[2]  He uses American Sign Language ("ASL") to communicate and contends that it is his primary and preferred method of communication.  Pl. 56.1 Counter ¶ 5; Def. 56.1 Counter ¶ 4.  The Plaza is a "skilled nursing facility" that provides "short term rehabilitation" to its residents.  Pl. 56.1 Counter ¶ 2.  Citadel provides management and oversight to the Plaza.  *Id.* ¶ 3.

From approximately December 26, 2018 to February 1, 2019, following a heart surgery, Plaintiff was a resident at the Plaza.  Def. 56.1 Counter ¶ 1.  Plaintiff contends that the Plaza has a policy to "provide interpreters, and/or auxiliary aids to non-English speaking persons, where necessary to afford such persons an equal opportunity to benefit from the services provided and that such interpreters will be provided at no cost to the resident."  ECF

_____

("Krupnick Decl.")), and attached exhibits (ECF Nos. 81-1 to 81-2; 84-1 to 84-11).  Plaintiff filed a brief in opposition (ECF No. 86 ("Pl. Opp.")), corresponding exhibits (ECF No. 86-1), and a counterstatement to Defendants' Rule 56.1 Statement (ECF No. 88 ("Pl. 56.1 Counter")).  Defendants filed a reply brief as well.  ECF No. 91 ("Def. Reply").

Finally, the Court notes that there are numbering errors in Defendants' counterstatement to Plaintiff's Rule 56.1 Statement.  *See* Def. 56.1 Counter.  Therefore, the Court's citations to this document reflect the following changes: Paragraph 59, at ECF page 13, is not the line starting with "RESPONSE," but the following paragraph referred to as ¶ 60.  On ECF page 14, the first paragraph is in fact ¶ 60.  Additionally, on ECF page 18, paragraph 80 is not the line starting with "RESPONSE," but the following paragraph referred to as ¶ 81.  Thereafter, paragraph 82 becomes ¶ 81, and paragraph 83 becomes ¶ 82, and on ECF page 19, the first paragraph 84 becomes ¶ 83.  These changes are consistent with the numbering of Plaintiff's Rule 56.1 Statement.

[2] Unless otherwise stated, the facts recited herein are undisputed.

No. 78-1 at -002; Def. 56.1 Counter ¶ 23.  In order to provide such services, the Plaza has a contract with Stratus "to provide sign-language interpretation services for deaf patients through Video Remote Interpreting or VRI at the Plaza's cost."  Def. 56.1 Counter ¶ 24. When the Plaza's staff needs to use VRI with a resident, they are generally trained to "retrieve and set up the iPad" that includes the VRI program.  *See id.* ¶ 33.  The Plaza's Director of Education, Darryl Thomas, testified that it is not the resident's responsibility to retrieve the iPad from the "nursing station" in order to use VRI.  *Id.* ¶ 32.  The Plaza's "policy is to record any use of VRI and the interpreter's work ID number in a patient's chart."  *Id.* ¶ 34.  The parties agree that the Stratus invoices to the Plaza do not independently provide information regarding Defendants' use of VRI during Plaintiff's stay at the Plaza.  *Id.* ¶ 76.

Prior to Plaintiff's arrival at the Plaza, staff were made aware that he was deaf and would need to use sign language interpretation services.  *Id.* ¶ 35.  Defendants admit that they could afford interpreters for Plaintiff's stay, and that providing ASL interpreter services during his stay "would not impose an undue burden or fundamental alteration" on them.  *Id.* ¶¶ 48-49.  The Plaza assigned a speech language pathologist, Jane Krupnick, to Plaintiff "to assess his communication needs" while at the Plaza.  *Id.* ¶ 36.  Ms. Krupnick testified in her deposition that when she met Plaintiff on December 26, 2018, he communicated that "ASL was his primary and preferred language and that he did not want to use speech to communicate."  *Id.* ¶ 52.  Ms. Krupnick testified that she used VRI for Plaintiff's initial evaluation.  *Id.* ¶ 53.  The VRI device "was presented to Plaintiff the day he was admitted," Pl. 56.1 Counter ¶ 16, and even though he had prior experience using VRI, *id.* ¶ 17, Ms. Krupnick spent ten sessions training Plaintiff and staff to use the VRI device, *id.* ¶ 19; Krupnick Decl. ¶ 6.  During Plaintiff's stay at the Plaza, the VRI device was located at the

nursing station, and his chart indicated to providers that they should use the device to communicate with Plaintiff. *Id.* ¶ 20; *see also* Krupnick Decl. ¶ 7. Notwithstanding this, in a declaration submitted in support of Defendants' motion for summary judgment, Ms. Krupnick contends that she "determined that he was high functioning and could comfortably make his needs known without an assistive device[.]" Krupnick Decl. ¶ 5.

The parties agree that the VRI device was used by staff to communicate with Plaintiff on several occasions during his stay. *See* Def. 56.1 Counter ¶¶ 55-56 (noting that staff testified they used VRI with Plaintiff). Plaintiff agrees that VRI – that is, Stratus Video – was used by Ms. Krupnick and others during Plaintiff's admission on or around December 26, 2018. *See id.* ¶¶ 51-56. The parties also agree that Mr. Koranteng, a social worker, used VRI during meetings with Plaintiff on January 2, 2019, January 9, 2019, January 15, 2019, and January 23, 2019. *See id.* ¶¶ 57, 60-61. The parties otherwise disagree as to when, and how frequently, VRI was used. *See, e.g.*, *id.* ¶ 63. Plaintiff contends that staff used lip reading or writing notes to communicate with him and points to some medical records in support of this contention. *Id.* ¶¶ 10-11. He further testified that he is unable to read well, can only understand a "little bit" of lip reading, and can only use gestures or writing to communicate very simple concepts. *Id.* ¶¶ 16-22. Finally, without providing details, Plaintiff asserts that at times he asked for an interpreter and it was refused. *See id.* ¶¶ 63; 68. He specifically contends that he was refused an interpreter at his discharge meeting. *Id.* ¶ 68.

The Plaza staff created case notes that describe their interactions with Plaintiff and, in some cases, the means by which the parties communicated. Some of the notes are consistent with the parties' contentions and recollections, and some are not. A December 26, 2018 contemporaneous record created by medical staff – including Dr. Kyongmi Kim and nurse

Walter Kim – indicates an order was put in to "[u]se Ipad in Medication Room for Stratus Video – Sign Language Interpretation."  ECF No. 84-3 at -048, -613; *see also* ECF No. 78-1 at -088.  Similarly, progress notes from that day indicate that "[r]esident is deaf, requires the use of Stratus Video for American Sign Language.  Able to make needs known."  ECF No. 84-3 at -615; *see also id.* at -618 ("Currently resident is able to make basic needs known via telegraphic speech but requires an augmentative device, Stratus Video for American Sign Language, for maximum communicative effectiveness.").  In another progress note from December 27, 2018, LPN Tiffany Massey noted that "Resident is alert and verbally responsive . . . resident is deaf but able to make needs known."  *Id.* at -618.  In another record dated December 27, 2018,[3] staff noted that "[p]atient needs sign language translation," and that his speech is "impaired," but he is "[a]ble to make basic needs known," "[u]ses gestures," and "[s]igns."  ECF No. 78-1 at -133.  On that same document, staff did not check off boxes indicating that Plaintiff's speech was functional, that he can read or write, that he has a hearing aid, or that he can read lips.  *Id.*

A December 28, 2018 note from LPN Janette Baker states that Plaintiff "[u]ses phone app ASL translation for deaf/mute communicat[e] effectively."  ECF No. 84-3 at 624.  On December 29, 2018, Ms. Baker noted that Plaintiff "[c]ontinues to use phone app ASL translation for communication."  *Id.*  That same day, LMP Adeola Dada noted: Resident is deaf, interpreter contact during medication pass."  *Id.*  On January 1, 2019, RN Salamma

---

[3] The parties state that the record was made on December 26, 2018, but the document itself indicates it was completed on December 27, 2018.  ECF No. 78-1 at -133.

The Court further notes that Plaintiff did not provide the Court with complete records from Plaintiff's stay at the Plaza, but rather seemingly individual pages from Plaintiff's medical records.  *See generally* ECF No. 78-1.

George made a note that "Resident is alert & responsive.  He is deaf and communicating through sign language."  *Id.* at -626.  On January 2, 2019, RN Olivia Collings noted that Plaintiff was "able to make needs known using sign language through video communicating device."  *Id.*  On January 3, 2019, Eric Koranteng noted that "Resident is deaf, therefore a video communication board was used to communicate with resident" about policies and procedures.  *Id.* at -630.

On January 5, 2019, when RN Jofinni Pabillore noted that Plaintiff "[s]peaks slowly and can verbalized [sic] some words."  *Id.* at -631.  There is evidence that staff used VRI to communicate with Plaintiff for interviews on January 9, January 15, and January 23, 2019.  Def. 56.1 Counter ¶¶ 60-61.  VRI is not mentioned in the notes provided to the Court again until January 14, 2019, when Dr. Kim noted that, at Plaintiff's request, she used Stratus Video with him.  ECF No. 84-3 at -645.  On January 15, 2019, LPN Bimbola Komolafo noted that Plaintiff was "able to make needs known."  *Id.*  On January 16, 2019, Dr. Kim again noted that she examined Plaintiff and used Stratus Video.  *Id.* at -647.  RN Salamma George and LMO Rejoyce Afram also saw Plaintiff that day and noted that he was "able to make needs known."  *Id.*  The same note was made on January 20, 2019.  *Id.* at -654.  On January 21, 2019, Dr. Kim indicated that she "[s]poke w[ith] the patient" but did not note that VRI was used.  *Id.* at -655.  LPN Janette Baker saw him that day as well and noted that he was "verbally responsive."  *Id.*

The records additionally contain speech therapy notes that were made from December 26, 2018 through January 8, 2019.  *See* ECF No. 78-1 at -202, -325, -675, -676.  In those records, staff noted that Plaintiff's "communication system" included "[v]erbal, [g]estural."

*Id.* at -202, -675.  The records indicate that Plaintiff had access to a "[r]elay translator" and

the device was available "24/7."  *Id.*  The records further reflect the following impressions:

> Patient . . . [is] able to make basic wants known via telegraphic
> speech; patient also able to lip read, however requires an
> augmentative device for maximum communicative effectiveness.
> Patient prefers use of a Relay Translator, Stratus Video for
> American Sign Language.  Skilled intervention is warranted to
> facilitate use of device in SNF setting to maximize patient's
> communication abilities.
>
> Patient requires skilled SLP services for communication to assess
> & train in patient centered AAC system in order to enhance
> patient's quality of life by improving ability to participate in
> meaningful interactions, communicate medical needs,
> communicate complex thoughts, ideas, opinions and/or feels and
> increase ability to participate in ADLs.

*Id.* at -202, -675.  The "Speech Therapy Discharge Summary" further notes that nursing

caregivers were "[i]nstructed . . . in use of augmentative communicative system" and "trained

in use of Stratus Video."  *Id.* at -325, -676.

Finally, on January 30, 2019, there is a record of notes from a discharge planning

meeting.  *See* ECF No. 84-3 at -702.  Under "Additional Comments" there is a note that a

"sign language interpreter was used during meeting."  *Id.*  However, in the meeting

description, there is a note that Plaintiff "declined the use of translation Ipad services."  *Id.*

Plaintiff disputes these notes, and testified that he "requested an interpreter for the Notice of

Transfer/Discharge form but that staff refused and gestured that he needed to sign the papers."

Def. 56.1 Counter ¶ 68; *see* ECF No. 78-1 at -709.  The parties vigorously disagree as to

whether Plaintiff requested or refused these services, though they ultimately agree that VRI

was not used for the discharge meeting.  *See, e.g.*, Def. 56.1 Counter ¶¶ 65, 67-68.  He left the

Plaza, after about a one-month stay, on February 1, 2019.  *Id.* ¶ 1.

## II.       Procedural History

Plaintiff initiated this action on February 11, 2020.  *See* Compl.  In his complaint, he asserts causes of action under federal, state, and city statutes alleging that Defendants discriminated against him on the basis of his disability by failing to provide him with ASL interpreters in violation of the ADA, RA, ACA, NYSHRL, NYCHRL, and New York Public Health Law.  *See generally* Compl.  Plaintiff seeks injunctive relief, as well as compensatory and punitive damages.  *See id.*  He contends that he suffered emotional distress as a result of his stay at the Plaza.  *See* Def. 56.1 Counter ¶ 83.  After the parties concluded discovery, the case was reassigned to the undersigned on September 19, 2022.  ECF No. 77.  On September 20, 2022, per the Court's prior orders, the parties submitted fully-briefed cross-motions for summary judgment.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, a moving party is entitled to summary judgment if, on any claim or defense, that party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "genuine" dispute is one in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" only if it "might affect the outcome of the suit under the governing law . . . ."  *Id.*  Thus, "the substantive law will identify which facts are material."  *Id.*

At summary judgment, the Court's task is simply to "discern[] whether there are any genuine issues of material fact to be tried, not to decid[e] them."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  Therefore, "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence

are matters for the jury, not for the court on a motion for summary judgment." *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997).  The Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Est. of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016) (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)). "Affidavits submitted in support of or in opposition to the summary judgment motion must 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (internal citation omitted); *see also* Fed. R. Civ. P. 56(c)(4).  "When deciding cross-motions for summary judgment, the standard to be applied 'is the same as that for individual summary judgment motions and a court must consider each motion independent of the other.'" *Garrett v. Music Publ'n Co. of Am., LLC*, 740 F. Supp. 2d 457, 460 (S.D.N.Y. 2010) (quoting *Schultz v. Stoner*, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004)).

## DISCUSSION

Plaintiff alleges claims under the ADA, RA, ACA, and New York State and City statutes.  The Court considers each motion for summary judgment independently and will resolve all ambiguities against the nonmoving party.  Nevertheless, because the parties' motions overlap regarding the claims for which they seek resolution, the Court will address each claim and the parties' arguments with respect to them in turn.

### I.    ADA Claim

As an initial matter, Plaintiff originally alleged in his ADA claim that, in addition to monetary damages, he was entitled to injunctive relief.  *See* Compl. ¶¶ 41-55.  Plaintiff now withdraws his claim for injunctive relief.  Pl. Br. at 3 n.5.  It is well-established that a Title III

ADA claim allows for only injunctive relief, not monetary damages. *See Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 86 (2d Cir. 2004) ("A private individual may only obtain injunctive relief for violations of a right granted under Title III; he cannot recover damages."). Because Plaintiff no longer seeks injunctive relief, his ADA claim must be dismissed. *See, e.g.*, *Brief v. Albert Einstein Coll. of Med.*, 423 F. App'x 88, 90 (2d Cir. 2011).

## II.      Rehabilitation Act Claim

Both parties argue that there is no genuine dispute of material fact with respect to Plaintiff's Rehabilitation Act claim and seek judgment in their favor.  "Section 504 of the Rehabilitation Act prohibits programs and activities receiving federal financial assistance from excluding, denying benefits to, or discriminating against 'otherwise qualified' disabled individuals." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012) (quoting 29 U.S.C. § 794(a)).  In order to establish a violation of the RA, a plaintiff must show the following:  (1) that he is an individual with a disability as defined in the statute; (2) that he is "otherwise qualified" for the program or activity; (3) that "he is excluded from benefits solely because of his disability;" and (4) that the program receives federal funding. *Cianciotto on behalf of D.S. v. N.Y.C. Dep't of Educ.*, 600 F. Supp. 3d 434, 458 (S.D.N.Y. 2022) (alterations adopted) (quoting *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 840-41 (2d Cir. 2014)).

The parties agree that Plaintiff is disabled and "otherwise qualified" within the meaning of the RA, and that the Plaza receives federal funding. *See* Def. Br. at 4-5 (noting that Plaintiff's only "pertinent question" is whether he was treated differently because the Plaza would not provide him an interpreter).  Therefore, the dispute here centers on the third

element of Plaintiff's RA clam: whether Defendants discriminated against Plaintiff due to his disability.  The parties also dispute whether Plaintiff is entitled to monetary damages.

### A. Discrimination on the Basis of Disability

Generally speaking, under the RA, an entity who receives federal funds "discriminates against a[n] . . . individual with a disability when it fails to provide 'meaningful access' to its benefits, programs, or services." *Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.*, 11 F.4th 55, 61 (2d Cir. 2021) (quoting *Disabled in Action v. Bd. of Elections*, 752 F.3d 189, 197 (2d Cir. 2014)).  "To ensure 'meaningful access[,]' [that] entity must make 'reasonable accommodations in [its] program or benefits.'" *Id*. at 61-62 (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985)).  In other words, an entity covered by the RA "must provide the assistance necessary to permit a disabled individual to participate in the relevant activities." *Berry-Mayes for Est. of Berry v. N.Y. Health & Hosps. Corp.*, No. 14-cv-9891 (PKC), 2016 WL 8461191, at *4 (S.D.N.Y. Sept. 19, 2016).  "Determining the 'reasonableness of an [ ] accommodation is a 'fact-specific' question that often must be resolved by a factfinder.'" *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72-73 (2d Cir. 2016) (quoting *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015)).  A reasonable "accommodation need not be perfect or the one most strongly preferred by the plaintiff, but it still must be effective." *Id.* at 72. (internal citations and quotation marks omitted) (alterations adopted).  With respect to medical services, the RA "does not ensure equal medical treatment, but does require equal access to and equal participation in a patient's own treatment." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2004).

The implementing regulations of the RA further mandate that recipients of federal funding, like the Plaza, who "provid[e] health, welfare, or other social services or benefits, . . .

may not, on the basis of handicap, . . . [p]rovide benefits or services in a manner that limits or

has the effect of limiting the participation of qualified handicapped persons . . . ."  45 C.F.R.

§ 84.52(a)(4); *see also* 45 C.F.R. § 84.4(b)(1)(ii); *Fantasia v. Montefiore New Rochelle*, No.

19-cv-11054 (VB), 2022 WL 294078, at *5 (S.D.N.Y. Feb. 1, 2022) (articulating

implementing regulations of the RA).  Under those regulations, a recipient of federal funds

that "employs fifteen or more persons shall provide appropriate auxiliary aids to persons with

impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal

opportunity to benefit from the service in question."  45 C.F.R. § 84.52(d)(1); *see also* 45

C.F.R. § 84.4(b)(2) ("For purposes of this part, aids, benefits, and services, to be equally

effective, are not required to produce the identical result or level of achievement for

handicapped and nonhandicapped persons, but must afford handicapped persons equal

opportunity to obtain the same result, to gain the same benefit, or to reach the same level of

achievement, in the most integrated setting appropriate to the person's needs.").

        In light of these principles and regulations, courts in this District have generally held

that, when a plaintiff's disability involves hearing loss, "[i]n order to establish

[discrimination] . . . [the p]laintiff must demonstrate that [the defendant] did not provide a

means of effective communication and thus denied her meaningful access to [its] services."

*Luckey v. St. Luke's Cornwall Hosp.*, No. 20-cv-1161 (NSR), 2021 WL 4124840, at *4

(S.D.N.Y. Sept. 9, 2021) (internal citations and quotation marks omitted); *see also e.g.*, *Berry-*

*Mayes for Est. of Berry*, 2016 WL 8461191, at *10 (concluding that plaintiff failed to show

dispute of material fact as to whether reasonable accommodation was provided to allow

plaintiff to effectively communicate with hospital staff).  Put another way, "[t]o determine

whether an auxiliary aid was 'necessary' or whether the auxiliary aid provided was

'appropriate' for a hospital patient, courts have looked to whether that patient could effectively communicate with hospital staff without any aid or with the aid provided[.]" *Fantasia,* 2022 WL 294078, at *5.  An interpreter is one form of auxiliary aid.  *See* 45 C.F.R. § 84.52(d)(3); *Van Vorst v. Lutheran Healthcare*, No. 15-cv-01667 (LDH) (PK), 2018 WL 11488149, at *2 (E.D.N.Y. Sept. 26, 2018) ("[A]uxiliary aids and services include, among other things, qualified interpreters on-site or [VRI] services." (quoting 28 C.F.R. § 36.303(b)(1)).

In certain circumstances, "courts have found that deaf plaintiffs have been deprived of 'an equal opportunity to benefit from' the [defendant's] services by the failure of medical staff to provide an interpreter[.]"  *Luckey,* 2021 WL 4124840, at *5.  But the determination of whether an entity "provided appropriate auxiliary aids where necessary is inherently fact-intensive," as the Court must consider whether the plaintiff could effectively communicate without that aid.  *Id.* (quoting *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 342-43 (11th Cir. 2012)); *see also Fantasia,* 2022 WL 294078, at *5.  For example, in *Biondo v. Kaledia Health*, a deaf patient noted on her hospital admission form that she prefers "written" communication and requested an ASL interpreter.  935 F.3d 68, 70 (2d Cir. 2019).  She was admitted to the hospital for approximately six days.  *Id.* at 71.  During that time, staff did not use an interpreter in discussions regarding her medical history, condition, and treatment, when she was examined, and when she underwent several procedures.  *See id.* at 70-72.  The Second Circuit concluded summary judgment was inappropriate, and explained that "[w]hile the RA does not in terms require the use of interpreters, a reasonable jury could find, given the circumstances, that the failure to provide one deprived [plaintiff] of 'an equal opportunity to benefit from' the hospital's services given her limitations with written English, the length of

13

her hospital stay, and the procedures performed and information imparted during her stay." *Id.* at 74 (quoting 45 C.F.R. § 84.52(d)(1)).

Here, it is undisputed that prior to Plaintiff's admission to the Plaza, staff were made aware that he was deaf and would need to use sign language interpretation services during his stay. Def. 56.1 Counter ¶ 35. The Plaza's staff was under an order to use the VRI with Plaintiff. *See* ECF No. 84-3 at -048, -613 (order to use Stratus Video with patient). It is also undisputed that, during his stay, VRI was used by certain staff during several interactions with Plaintiff. *See, e.g.*, Def. 56.1 Counter ¶¶ 52-53, 57, 60-62. Plaintiff contends that VRI was used only on the following days: December 26, 2018 (by Ms. Krupnick), January 2, 2019, January 9, 2019, January 15, 2019, and January 23, 2019 (by Mr. Koranteng and staff). *See id.* Case notes suggest that VRI may have been used on some other occasions. *See* ECF No. 84-3 at -624 (December 29, 2018 note that there was "interpreter contact during medication pass"); *id.* at -626 (January 2, 2019 note that Plaintiff was "able to make needs known using sign language through video communicating device"); *id.* at -647 (January 16, 2019 note that Dr. Kim examined Plaintiff using the Stratus video). Nevertheless, Plaintiff asserts that he frequently interacted with staff without the VRI. *See* Def. 56.1 Counter ¶¶ 63-68. Several Plaza witnesses also testified at their depositions that they sometimes communicated with Plaintiff through telegraphic speech (condensed or abbreviated speech), gestures, and some minimal language. *See, e.g.*, Def. 56.1 Counter ¶¶ 69-71 (Dr. Kim testimony); 74-75 (Ms. Salce testimony).

Notwithstanding the discrepancies regarding the precise dates on which the VRI was used, Defendants do not dispute that on at least some occasions, staff did not use VRI with Plaintiff during his stay at the Plaza. Rather, they contend that the VRI was available to

14

Plaintiff for the duration of his stay; in other words, he "knew where the VRI device was, could point to where it was, how to ask for it, how to use it, and the staff was trained how to use the device." Def. Br. at 13. In Defendants' view, having the VRI available on request is consistent with their policy to "provide interpreters, and/or auxiliary aids to non-English speaking persons, where necessary to afford such persons an equal opportunity to benefit from the services provided and that such interpreters will be provided at no cost to the resident." ECF No. 78-1 at -001; Def. 56.1 Counter ¶ 23. Plaintiff does not dispute that the VRI device was at the nursing station or that staff knew how to use it, but primarily contends that it was the staff's responsibility, not his, to initiate the use of the VRI at each interaction. *See, e.g.*, Pl. 56.1 Counter ¶¶ 15-18 (objecting to implication that Plaintiff had "ability or obligation" to retrieve and set up VRI device). In addition, Plaintiff contends (and Defendants deny) that, when staff would arrive without the VRI device, he would request it, but access was denied. *See* Def. 56.1 Counter ¶¶ 63, 68. By not always using the VRI device, Plaintiff claims his rights were violated.

Defendants further argue that, even if the VRI device was not always used with Plaintiff, the device was not necessary because Plaintiff could effectively communicate in those limited interactions. *See, e.g.*, Def. Opp. at 6. For instance, Defendants point to the progress notes on dates such as December 28, 2018 and December 29, 2018, when staff indicated in their notes that Plaintiff effectively used a phone application to communicate with staff member, Ms. Baker. *See id.* at 8; *see also* ECF No. 84-3 at -624. There are other references in the progress notes to Plaintiff being able to effectively communicate with staff, despite there being no indication that VRI was used. *See, e.g.*, ECF No. 84-3 at -618 ("Resident is alert and verbally responsive . . . resident is deaf but able to make needs

known.").  Defendants point to evidence – which Plaintiff disputes – that Plaintiff did not

require sign language interpretation at various jobs he held, and that he often communicated

with employers, co-workers, and friends, through gestures or Spanish.  Pl. 56.1 Counter ¶¶ 10-

11.  In support of their view of these facts, Defendants also point to Plaintiff's testimony that

he can be forgetful.  *See* Def. Opp. at 5.

Plaintiff disputes that he was able to effectively communicate with staff through lip

reading or telegraphic speech, without the use of VRI.  *See* Pl. 56.1 Counter ¶ 9 (citing

Plaintiff's deposition testimony that he does not understand most lip reading).  He further

states (and Defendants dispute) that he "had difficulty understanding his medications and

treatment due to the lack of interpreters."  Def. 56.1 Counter ¶ 64.

Based on the foregoing, there are genuine issues of material fact in dispute here.  The

material facts in dispute concern (a) whether and under what circumstances VRI – a

reasonable accommodation, or "auxiliary aid" – was available to Plaintiff during his

interactions at the Plaza, and (b) if it was not, whether Plaintiff effectively communicated

using other methods of communication.  Factors such as the purpose of the visit from staff,

the level of complexity regarding what was discussed during each interaction, the length of

the visit, and other relevant facts may contribute to whether the methods of communication

were effective.  *See Bustos v. Dignity Health*, No. cv-17-02882 (PHX) (DGC), 2019 WL

3532158, at *3 (D. Ariz. Aug. 2, 2019) (denying summary judgment where "Defendants have

not shown that [plaintiff]'s knowledge and limited use of English compel[led] a finding that

the exchange of written notes was an effective form of communication [because] . . . the type

of auxiliary aid needed to ensure effective communication depends in large part on the nature

and complexity of the communication involved and the context in which the communication occurs").

This is not a case where the auxiliary aid was indisputably provided at all times to Plaintiff. *Cf. Noll*, 787 F.3d at 95 (affirming granting of summary judgment for the defendant employer that made several accommodations for the deaf plaintiff, including indisputably having interpreter services "available both on-site and remotely"). While the RA and its regulations "do not require that a sign language interpreter be provided for every interaction with a hearing-impaired patient," Plaintiff has put forth evidence that he requested an interpreter/VRI, that an order for VRI was on his chart, that VRI was not always used in spite of that order and specific requests by him, and that he was unable to effectively communicate without some form of interpretation services. *Berry-Mayes for Est. of Berry*, 2016 WL 8461191, at *6; *cf. id.* at *6, *10 (granting summary judgment for defendants where, even though interpreters were not always used with deaf plaintiff, he "has not explained how these interactions with staff violated [his] right to equal access to the [defendant hospital]'s services" and because "there is no evidence that the hospital ever denied [plaintiff] . . . an interpreter when one was requested"). There also remains a dispute here regarding the subject matter, scope, and length of Plaintiff's interactions with staff, and whether or not he could, in light of the nature of those interactions, effectively communicate without an interpreter via lip reading, gestures, or notes. In sum, because there are material facts in dispute with regard to the availability and usage of the VRI, and whether Plaintiff could effectively communicate through other methods, the Court denies both parties' motions with respect to Plaintiff's RA claim.

**B. Damages**

To recover monetary damages under the RA, a plaintiff must demonstrate that the defendants intentionally violated the statute. *See Loeffler*, 582 F.3d at 275. An intentional violation – that is, intentional discrimination – "may be inferred when a qualifying official, or policymaker, acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result." *Biondo*, 935 F.3d at 73 (internal quotation marks and citations omitted). Deliberate indifference is shown when "[a]n official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Loeffler*, 582 F.3d 276. "[A]n official or policymaker must be someone who has some discretion at a key decision point in the administrative process." *Biondo*, 935 F.3d at 76 (internal quotation marks and citation omitted). "[D]eliberate indifference must be a 'deliberate choice . . . rather than negligence or bureaucratic inaction.'" *Loeffler*, 582 F.3d at 276 (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007)).

In *Loeffler*, the Second Circuit evaluated a claim brought by a deaf patient, his wife (who was also deaf), and their two children, against a hospital that failed to provide a sign language interpreter, forcing their children to act as interpreters during serious medical situations. *Id.* at 270-73. The district court granted summary judgment for the hospital with respect to whether it had exhibited deliberate indifference. *Id.* at 270-71. The Second Circuit acknowledged that "the Hospital [had] . . . a policy in place to provide interpreters," at least one staff member "made some efforts . . . to find an interpreter, and the law does not require her to have succeeded." *Id.* at 276-77. However, the Second Circuit stressed that the

plaintiffs made several attempts to secure an interpreter that went unheeded; in fact, the plaintiffs claimed that the doctor "laughed off" their requests for an interpreter. *Id*. at 276. The Second Circuit therefore reversed the grant of summary judgment because the testimony from the plaintiffs and others, "together with the obvious shortcomings in the policy and the [defendant] Hospital's conduct, as well as the alleged apathetic response of [a doctor], notwithstanding his authority to correct the discrimination, could lead a reasonable jury to conclude that the Hospital was deliberately indifferent; and its indifference to the [plaintiffs'] rights may have been so pervasive as to amount to a choice." *Id.* at 277. Conversely, in *Viera v. City of New York*, the court granted summary judgment for the defendant hospital because the plaintiff (the mother of a deaf patient) had not requested an interpreter, the staff and primary contacts at the hospital had testified that they believed they were effectively communicating with the plaintiff and the patient, and the plaintiff was unable to show evidence to the contrary. No. 15-cv-05430 (PGG), 2017 WL 3130332, at *15-18 (S.D.N.Y. July 21, 2017). The court explained that while the plaintiff "now attempts to demonstrate that she was confused or uncertain about [the patient's] condition, she has not proffered sufficient evidence to create a material issue of fact as to whether [the staff] realized or should have realized that they were not effectively communicating with her." *Id.* at *17.

This case is closer on the spectrum to *Loeffler* than to *Viera*. While Defendants appear to dispute whether Plaintiff consistently requested VRI, it is undisputed that, after Ms. Krupnick assessed Plaintiff, she put in an order for staff to use VRI with him. ECF No. 84-3 at -048, -613; *see also* ECF No. 78-1 at -088. Staff were also trained to use VRI. ECF No. 78-1 at -325, -676. Nevertheless, Plaintiff contends – and some progress notes indicate – that, despite the instruction in his chart, staff did not always use the VRI with Plaintiff. *See* Def.

56.1 Counter ¶¶ 10-11, 63; *see, e.g.*, ECF No. 84-3 at -624.  Plaintiff further asserts that at times he asked for an interpreter, and it was refused.  *See, e.g.*, *id.* ¶¶ 63, 68.  Moreover, Plaintiff's doctor, Dr. Kim, testified that "she may have written notes with [P]laintiff instead of using interpretation services."  *Id.* ¶ 69; *see also* ECF No. 84-3 at -655 (note from Dr. Kim indicating that she "[s]poke w[ith] the patient" but did not note that VRI was used).  As in *Loeffler*, a doctor is almost certainly a figure with sufficient discretion to make decisions.  While there is no evidence that any doctor or staff member callously "laughed off" Plaintiff's request for an interpreter, as in *Loeffler*, there is evidence in the record that the Plaza had a policy to provide interpreters or VRI services, there was an order in Plaintiff's chart to use VRI, and Plaintiff testified that he was refused such services when he requested them.  While this is a very close call, it is best left to the jury to decide whether Defendants acted with deliberate indifference – making a deliberate choice rather than negligently failing to provide adequate communication services – based on the jury's evaluation of the periodic usage of VRI, whether Defendants did in fact refuse to use VRI when Plaintiff requested it, and the circumstances surrounding when it was not used.  In sum, there are material facts in dispute with regard to whether Defendants acted with deliberate indifference.

The parties also dispute what type of damages are available, even if deliberate indifference can be proven.  Plaintiff seeks compensatory damages for his alleged harm under the RA.  *See* Compl. ¶ 63.  In his Complaint, Plaintiff alleges that he "endured protracted humiliation" due to Defendants' actions, and that he suffered from "greater levels of fear, anxiety, indignity, humiliation, and emotional distress than a hearing person would be expected to experience" when receiving medical care.  *Id.* ¶¶ 11, 34.

Defendants respond that Plaintiff has only asserted that he suffered emotional damages, and those are precluded under the RA as set forth in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562 (2022).  *See* Def. Br. at 13-14.  The Court agrees.  In that case, considering the RA and ACA specifically, the Supreme Court concluded that compensatory emotional damages are not available under statutes enacted by Congress pursuant to the Spending Clause, which permits damages that are "traditionally available in suits for breach of contract."  *Cummings*, 142 S. Ct. at 1571, 1576.  Therefore, *Cummings* prohibits the emotional damages that Plaintiff seeks.[4]

Plaintiff argues that, even if *Cummings* applies, he is entitled to other forms of compensatory damages, including those based on "an expectation interest" and those stemming from "dignitary harm."  Pl. Opp. at 20-23.  He also argues that he is entitled to nominal damages.  *Id.* at 23-24.  In response, Defendants point to *Fantasia v. Montefiore New Rochelle*, where the court engaged in a careful analysis to conclude that, while expectation damages might be available under the RA and ACA after *Cummings*, recovery is limited to an "amount that the evidence permits to be established with reasonable certainty."  No. 19-cv-01054 (VB), 2022 U.S. Dist. LEXIS 107935, at *6-7 (S.D.N.Y. June 16, 2022) (internal citation omitted).  Because the plaintiff there had not offered "sufficient evidence such that a factfinder could determine her expectation damages with reasonable certainty," she could not pursue them at trial.  *Id.* at *7.  Plaintiff's circumstances are identical to those in *Fantasia*; he

---

[4] Plaintiff argues that *Cummings* cannot be applied retroactively.  *See* Pl. Opp. at 18-20.  That argument is unpersuasive, as it is clear that "[w]hen [the Supreme Court] applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the Supreme Court's] announcement of the rule."  *Harper v. VA Dep't of Tax'n*, 509 U.S. 86, 97 (1993).

has offered merely broad strokes about his expectation interest in his ability to participate in his medical care.  *See* Pl. Reply at 9-10.  He has not pointed to any evidence in the record that could permit a jury to conclude, with reasonable certainty, that he is entitled to expectation damages.  *See id.*  Therefore, he is precluded from seeking expectation damages in this action.

Plaintiff's attempt to seek compensatory damages for dignitary harm also fails.  The court in *Fantasia* concluded that "damages for dignitary harm are not an available remedy for violations of the RA or ACA" because only certain statutes allow for recovery of tort damages (which would include dignitary harm) in contract claims, and the Supreme Court rejected such recovery in *Cummings*.  *Fantasia*, 2022 U.S. Dist. LEXIS 107935, at *9; *Vega-Ruiz v. Northwell Health Sys.*, No. 19-cv-00537 (GRB) (AYS), 2023 WL 2587508, at *3 (E.D.N.Y March 20, 2023) (rejecting claim for "dignitary harm" damages for RA claim because it was no longer viable after *Cummings*).  The cases cited by Plaintiff, which were also cited and rejected by the court in *Fantasia*, do not persuade the Court otherwise.  *See, e.g.*, *Camarillo v. Carrols Corp.*, 518 F.3d 153, 158 (2d Cir. 2008) (analyzing injury for purposes of standing but not addressing whether harm can be redressed by compensatory damages); *Carello v. Aurora Policemen Credit Union*, 930 F.3d 830, 833-34 (7th Cir. 2019) (same); *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 725 (8th Cir. 2003) (describing how dignitary injury can be remedied in ADA case through nominal damages, attorneys' fees, exemplary damages, and injunctive relief without mention of compensatory damages).  Moreover, the cases that permit compensatory damages post-*Cummings* do not allow recovery for dignitary harm, but only for the harm that comes from lost opportunities.  *See, e.g.*, *Montgomery v. D.C.*, No. cv-18-1928 (JDB), 2022 WL 1618741, at *25 (D.D.C. May 23, 2022) (concluding that the plaintiff "may be able to recover some small amount of damages to compensate him for the opportunity he

lost when he was denied the ability to meaningfully access and participate in his interrogations"); *Doe v. Fairfax Cnty. Sch. Bd.*, No. 18-cv-00614 (MSN) (IDD), 2023 WL 424265, at *4 (E.D. Va. Jan. 25, 2023) ("Several post-*Cummings* district courts have allowed plaintiffs to seek recovery for lost opportunities they suffered as a result of discrimination in violation of Spending Clause statutes.").  But Plaintiff has not sought damages for a lost opportunity here and instead seeks dignitary harm, which appears to be a veiled attempt to recover impermissible emotional distress damages.  *See Hejmej v. Peconic Bay Med. Ctr.*, 17-cv-00782 (JMA) (SIL) 2022 WL 4551696, at *1 n.3 (E.D.N.Y. Sept. 29, 2022) (following *Fantasia* and rejecting claim for damages based on "indignity" under the RA because they are a rebranding of emotional distress damages).  The Court therefore agrees with the reasoning in *Fantasia*, 2022 U.S. Dist. LEXIS 107935, at *9, and concludes that compensatory damages sought for dignitary harm are not permitted under the RA.  Accordingly, Plaintiff may not seek damages for dignitary harm.

Plaintiff may, however, seek nominal damages under the RA even after *Cummings*. As the *Fantasia* court noted, in contract actions, "if a plaintiff cannot show actual damages flowing from the breach of contract, she is entitled to nominal damages." *Id.* at *11.  This is true even if nominal damages were not explicitly pleaded in the complaint. *Id.* (citing *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 651 (2d Cir. 1998)).  Other courts are in accord. *See Hejmej*, 2022 WL 4551696, at *1 (modifying report and recommendation to permit nominal damages in case involving RA and ACA claims); *Vega-Ruiz*, 2023 WL 2587508, at *3 (permitting nominal damages for RA claim).  Accordingly, Plaintiff may only pursue nominal damages with regard to his RA claim at trial.

### III.    Affordable Care Act Claim

Both parties also contend that they are entitled to summary judgment with respect to Plaintiff's claim under the ACA.  The two disputes at issue with respect to the ACA claim are (1) whether Defendants gave primary consideration to Plaintiff's request when determining what type of auxiliary aid was necessary, and (2) whether or not Plaintiff is entitled to monetary damages.  As to the latter dispute, the analysis with respect to the ACA and RA is the same, and therefore Plaintiff is only entitled to seek nominal damages after *Cummings* for the reasons discussed in Section II(B).  *See Fantasia*, 2022 U.S. Dist. LEXIS 107935, at *4, *7, *9, *11.  Therefore, the Court now turns to whether or not Plaintiff's request for an interpreter was given primary consideration.

Section 1557 of the Affordable Care Act provides that "an individual shall not . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . . ."  42 U.S.C. § 18116(a).  Claims under the ACA are generally analyzed in the same manner as claims under the RA, but the regulations implementing each statute differ in an important way.  *See Fantasia*, 2022 WL 294078, at *8.  Specifically, unlike the regulations under the RA, the ACA's implementing regulations provide that "an entity operating covered health programs or activities 'shall take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in such programs or activities, in accordance with' certain ADA regulations."  *Id.* (quoting 45 C.F.R. § 92.102(a)) (emphasis added); *see also Vega-Ruiz v. Northwell Health*, 992 F.3d 61, 65-66 (2d Cir. 2021).

24

Under those ADA regulations, "a covered entity must 'give primary consideration to the requests of individuals with disabilities' when 'determining what types of auxiliary aids and services are necessary.'" *Fantasia*, 2022 WL 294078, at *8 (quoting 28 C.F.R. § 35.160(b)(2)).  As the Second Circuit has stated, "the ACA extends 'primary consideration' to individuals seeking services at Title III public accommodations." *Vega-Ruiz*, 992 F.3d at 66.  "'Primary consideration' means Defendants 'must honor [Plaintiffs'] choice, unless [Defendants] can demonstrate that another equally effective means of communication is available or that the aid or service requested would fundamentally alter the nature of the program, service, or activity or would result in undue financial and administrative burdens.'" *Hernandez v. N.Y. State Bd. of Elections*, 479 F.Supp.3d 1, 12 (S.D.N.Y. 2020) (quoting federal guidance).  Summary judgment is therefore not appropriate if there are material facts in dispute as to whether Defendants gave primary consideration to Plaintiff's requested auxiliary aid, whether Defendants otherwise provided another equally effective means of communication, or whether the requested aid created an undue financial burden.  *See, e.g.*, *Parker v. William Beaumont Hosp.*, No. 20-12475, 2023 WL 3606653, at *10 (E.D. Mich. May 23, 2023) (denying summary judgment where there were material facts in dispute as to whether defendants afforded primary consideration to the plaintiff's request for an ASL interpreter).

Plaintiff contends that, by failing to use the VRI during each interaction, Defendants failed to give his request primary consideration.  As previously described, it is undisputed that VRI services were not used with Plaintiff every time the Plaza's staff interacted with him. *See, e.g.*, Def. 56.1 Counter ¶¶ 69-72, 74-75 (describing testimony from staff that they did not always use VRI).  Defendants also admit that using ASL interpreter services during his stay

"would not impose an undue burden or fundamental alteration."  Def. 56.1 Counter ¶¶ 48-49.

Defendants instead argue primarily that, as described *supra* Section II(A), the VRI was always

available to Plaintiff, there is no evidence that Plaintiff requested an in-person translator, and

staff never refused use of the VRI – rather, at times, Plaintiff refused the use of VRI services.

*See* Def. Opp. at 6, 12.  Moreover, Defendants argue that Plaintiff's ACA claim fails because

he had equally effective means to communicate with Plaza staff.  *See id.* at 9.  While Plaintiff

does not dispute that the VRI device was at the nursing station or that staff knew how to use

it, he contends that it was the staff's responsibility, not his, to initiate the use of the VRI for

each interaction – and therefore, he disputes that the VRI was always available to him.  *See*,

*e.g.*, Pl. 56.1 Counter ¶¶ 16-18.  While the progress notes reflect that the VRI was not always

used, the parties dispute whether or not Plaintiff requested the VRI every time staff came to

speak with him.  *See, e.g.*, Def. 56.1 Counter ¶¶ 45, 68.  There are also factual disputes

regarding whether Defendants refused to provide the VRI when requested or whether Plaintiff

declined to use it when offered.  *See, e.g., id.* ¶¶ 63, 68; ECF No. 84-3 at -702.  Therefore,

there are material disputes of fact regarding whether or not Plaintiff's primary consideration

was honored at the Plaza.[5]

Even if Plaintiff's primary consideration was not honored at the Plaza, under the ACA,

Defendants would then need to show that they provided Plaintiff with an equally effective

means of communication.  *See* Def. Opp. at 9-10.  This is also in dispute.  The parties disagree

as to how frequently the VRI was used and, when it was not used, what methods were used to

communicate with Plaintiff.  *See, e.g.*, Def. 56.1 Counter ¶¶ 10-11, 62-63.  Plaintiff contends

---

[5] Plaintiff admits that his preferred method of communication was VRI or video interpreters.
*See* Def. 56.1 Counter ¶ 7.  Therefore, the Court need not address Defendants' arguments that
they did not need to provide in-person interpreters.

that staff communicated with him through lip reading, gestures, and notes, and some of the documents support this. *Id.* ¶¶ 10-11; *see, e.g.*, ECF No. 84-3 at -631 (noting that Plaintiff "[s]peaks slowly and can verbalize some words" without mentioning VRI use on January 5, 2019). But he also stated that he cannot read well, cannot read lips well, and only uses gestures or writing to communicate very simple concepts. Def. 56.1 Counter ¶¶ 16-22; Pl. 56.1 Counter ¶¶ 6-7 (dispute as to whether Plaintiff could effectively communicate through gestures or acting); ¶¶ 8-9 (dispute as to whether Plaintiff could effectively communicate through lip reading); ¶ 9 (dispute as to whether Plaintiff could effectively communicate through telegraphic speech). In response, Defendants offer disputed evidence that Plaintiff did not always use interpreters to communicate at prior jobs or in his daily life. *See* Pl. 56.1 Counter ¶ 10 (dispute about type of communication used at prior jobs). Plaintiff argues that other situations were unlike a medical setting at the Plaza. *See generally id.* ¶¶ 6-11. Therefore, even assuming that Plaintiff's primary consideration was not honored because it was not adequately available to Plaintiff, there is a dispute of material fact regarding whether he was able to use equally effective means to communicate with staff at the Plaza under the ACA. Accordingly, the Court denies both parties' motions with respect to the ACA claim. However, as previously explained, Plaintiff may only pursue nominal damages for his ACA claim.

## IV.    NYSHRL and NYCHRL Claims

Under the NYSHRL, "any place of public accommodation" may not discriminate on the basis of a disability. N.Y. Exec. Law § 296(2)(a). The NYSHRL "must be liberally construed to accomplish the purposes of the statute," such as "ensur[ing] that every person in [New York] . . . has an equal opportunity to enjoy a full and productive life," including but

not limited to "the opportunity to obtain adequate health care . . . ." *Cahill v. Rosa*, 89 N.Y.2d 14, 20 (1996) (internal quotation marks and citations omitted).  Under the NYCHRL, "places of public accommodation are required to make reasonable accommodations for persons with disabilities, and may not 'refuse, withhold from or deny to such [disabled] person any of the accommodations, advantages, facilities or privileges thereof.'"  *Loeffler*, 582 F.3d at 277 (quoting N.Y.C. Admin. Code § 8–107(4)(a)).  The NYCHRL is to be construed "more liberally" than its federal and state counterparts.  *See id.* at 278.  Because the NYSHRL is to be construed co-extensively with the RA, and the NYCHRL is to be interpreted more liberally than the RA, the Court concludes that summary judgment on liability is also inappropriate for Plaintiff's state and city claims for the same reasons that it was inappropriate for his RA and ACA claims.  *See Williams v. City of New York*, 121 F. Supp. 3d 354, 364 n.10 (S.D.N.Y. 2015) (explaining that claims under the ADA, RA, NYCHRL, and NYSHRL are generally coextensive).

In terms of damages, under the state and city claims, "[i]n order to recover compensatory damages under the NYSHRL and the NYCHRL, Plaintiff must demonstrate that she suffered 'humiliation' or 'mental anguish' as a result of the alleged discrimination." *Vega-Ruiz v. Montefiore Med. Ctr.*, No. 17-cv-01804 (LTS) (SDA), 2019 WL 3080906, at *5 (S.D.N.Y. July 15, 2019) (quoting *Cullen v. Nassau Cty. Civil Serv. Comm'n*, 53 N.Y.2d 492, 496-97 (N.Y. 1981)).  "No showing of intentional discrimination is required."  *Id.*; *see Fantasia*, 2022 WL 294078, at *10; *Cullen*, 53 N.Y.2d at 496 (noting that a plaintiff need not show intentional discrimination under NYSHRL).  Plaintiff contends that he suffered emotional distress as a result of his stay at the Plaza.  *See* Def. 56.1 Counter ¶¶ 83-84.  Unlike under the RA and ACA, such damages are not precluded by *Cummings*.  Plaintiff contends,

although Defendants dispute, that he was unable to understand his medications and treatment during his stay at the Plaza, which caused him emotional distress.  *Id.* ¶ 64.  In light of this dispute and the fact issues regarding provision of the VRI, the Court will not grant summary judgment to preclude the recovery of compensatory damages if liability is determined as to these claims.[6]

As to punitive damages, under the NYCHRL, "a plaintiff is entitled to punitive damages where the wrongdoer's actions amount to willful or wanton negligence, or recklessness, or where there is a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard."  *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 325 (S.D.N.Y. 2018) (quoting *Chauca v. Abraham*, 30 N.Y.3d 325, 329 (2017)).  This is a lower standard than under federal civil rights laws, where a showing of "malice or awareness of the violation of a protected right" is generally required.  *Id.*  Because there are factual disputes with regard to whether Plaintiff requested auxiliary services, including use of the VRI, but was refused those services, a reasonable jury may be able to conclude that the Plaza staff acted with "conscious disregard" for Plaintiff's rights, depending on the circumstances of the denials.  Although it may be difficult to prevail at trial on punitive damages, the Court will not grant summary judgment to preclude such damages at this time.

## V.    New York Public Health Law

Under New York Public Health Law § 2801-d(1), "[a]ny residential health care facility that deprives any patient of said facility of any right or benefit . . . shall be liable to said patient for injuries suffered as a result of said deprivation . . . ."  A right or benefit under the

---

[6] Because the Court denies summary judgment with respect to Plaintiff's NYCHRL claim, judgment on his statutory damages claim under the NYCHRL is also denied.  *See* Pl. Br. at 15.

statute includes "any right or benefit created or established for the well-being of the patient by the terms of any contract, by any state statute, code, rule or regulation or by any applicable federal statute, code, rule or regulation, where noncompliance by said facility with such statute, code, rule or regulation has not been expressly authorized by the appropriate governmental authority." *Id.* Recoverable injuries under the statute include both physical and emotional harm to the patient. *Id.*

Additionally, under § 2801-d(2), if "a patient has been deprived of a right or benefit," is injured as a result, and there is no "finding that the facility exercised all care reasonably necessary to prevent and limit the deprivation and injury to the patient," the patient is entitled to compensatory damages, which "shall be assessed in an amount sufficient to compensate such patient for such injury, but in no event less than twenty-five percent of the daily per-patient rate of payment established for the residential health care facility under section twenty-eight hundred seven of this article or, in the case of a residential health care facility not having such an established rate, the average daily total charges per patient for said facility, for each day that such injury exists."

Section 2803-c then enumerates some of the specific rights to which a patient may be deprived, and that may give rise to a suit under the statute. Under Section 2803-c, a facility that provides health related service must "make public a statement of the rights and responsibilities of the patients who are receiving care in such facilities, and shall treat such patients in accordance with the provisions of such statement." N.Y. Pub. Health Law § 2803-c(2). The notice of rights that Plaintiff alleges he signed articulates a right to equal access to care and freedom to make independent decisions. Def. 56.1 Counter ¶ 84.

Defendants argue that they are entitled to summary judgment because Plaintiff has not identified any rights or regulations that the Plaza violated that might serve as the basis for damages pursuant to § 2801d-(2).  *See* Def. Br. at 20-22; Def. Opp. at 22-24.  Because the Court has concluded that Plaintiff's claims under the RA, ACA, NYCHRL, and NYSHRL may proceed to trial, his claim under § 2801-d with respect to those claims may proceed as well because a "right or benefit" under § 2801-d(1) includes rights created by federal or state statutes.[7]

Defendants also do not significantly address Plaintiff's other apparent theories of liability under § 2801-d(1): that Plaintiff was deprived of a contractual right when he signed a "notice of 'Residents rights,'" and that he was deprived of "rights enumerated under Public Health Law § 2803-c(3)."  Pl. Br. at 16-17; *see* Def. Reply at 7-8.  Defendants have offered no real argument as to why they are entitled to summary judgment with respect to these theories of liability under the New York Public Health Law.  *See generally* Def. Br. at 20-21; *see also* Def. Opp. at 22-24.  Accordingly, the Court concludes that summary judgment on these claims is not warranted at this time.

## CONCLUSION

For the reasons set forth herein, Plaintiff's claim under the ADA is dismissed.  With respect to the remaining claims, Plaintiff's motion for summary judgment is DENIED, and Defendants' motion for summary judgment is DENIED in part, except that it is granted with respect to Plaintiff's claims for compensatory damages under the RA and ACA.  Only

---

[7] For the reasons set forth regarding the NYCHRL, the Court also concludes that summary judgment precluding punitive damages under the New York Public Health Law is similarly not appropriate.  *See* N.Y. Pub. Health Law § 2801-d(2) ("In addition, where the deprivation of any such right or benefit is found to have been willful or in reckless disregard of the lawful rights of the patient, punitive damages may be assessed.").

nominal damages may be pursued on those claims.  Within 14 days of the date of this Opinion & Order, the parties shall file a joint letter proposing at least three mutually agreeable dates to begin a jury trial.  The parties shall also include in such letter whether they request a referral to the S.D.N.Y.'s mediation program or to the Magistrate Judge for a settlement conference. Within 45 days of this Opinion & Order, the parties shall submit a joint pretrial order and additional pretrial materials specified in this Court's Individual Rules.

      The Clerk of Court is respectfully directed to terminate the motions pending at ECF Nos. 78 and 81.

Dated:  July 26, 2023
      New York, New York

                            SO ORDERED.

                            JENNIFER L. ROCHON
                            United States District Judge